IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEMETRIUS BAILEY, | : | CIVIL NO. 1:CV-07-2238 |
| Plaintiff, | : | |
| | : | (Judge Kane) |
| v. | : | |
| | : | |
| MELISSA McMAHON, et al., | : | |
| Defendants | : | |

## <u>MEMORANDUM</u>

The instant civil rights action was filed by Plaintiff Demetrius Bailey, a state inmate currently confined at the State Correctional Institution at Forest, Pennsylvania.  Presently pending is the Commonwealth Defendants' motion for summary judgment.  (Doc. No. 174.)  For the reasons that follow, the motion will be granted.[1]

## I.    BACKGROUND

Plaintiff's amended complaint names sixteen (16) defendants and sets forth numerous claims pursuant to 42 U.S.C. § 1983 involving incidents occurring at the State Correctional Institution at Huntingdon (SCI-Huntingdon), his former place of confinement.  (Doc. No. 27.) Named as Defendants are Pennsylvania Department of Corrections officials and SCI-Huntingdon employees, Prison Health Services ("PHS"), and Angela Auman, a physician's assistant employed by PHS.  (Doc. No. 27, Am. Compl.)  A motion to dismiss filed by PHS was granted on March 19, 2009.  (Doc. No. 61.)  A motion for summary judgment filed by Auman was granted on April 1, 2013.  (Doc. No. 187.)  Plaintiff has stipulated to the dismissal of defendants

---

[1]  Also pending are "Motions for Relief" recently filed by Plaintiff wherein he seeks to pursue a battery of new claims against unspecified Defendants who appear to be employees at the State Correctional Institution at Coal Township, Pennsylvania. (Doc. Nos. 200, 202.)  The motions will be denied without prejudice to any right Plaintiff may have to pursue these claims in a new civil rights action.

David Wakefield, Daniel Baird, Michael Harlow, Kevin Kauffman, Raymond Lawler and Lee Ann Mock.  (Doc. No. 199.)  Remaining as Defendants in this action are Jeffrey Beard, former Secretary of the DOC, and the following SCI-Huntingdon employees: Charles Mitchell, Hearing Examiner; Mary Lou Showalter, Health Care Administrator; Melissa McMahon, Psychologist Services Specialist; Dorina Varner, former Grievance Coordinator; Thomas Gembinski, Psychological Services Specialist/MHSC, and Correctional Officers Donald Fortney and Richard Hinkle (collectively, "Corrections Defendants").

In the amended complaint, Plaintiff alleges that Defendant Varner does not allow him to go to the law library with other inmates to work on the same cases when they are co-plaintiffs, makes him wear shackles in the library and fails to provide him with legal assistance and aides. (Doc. No. 27, Am. Comp. at ¶ 5.)   He further contends that he is denied adequate material to challenge his conviction and file lawsuits, which has resulted in missed court filings.  (Id. at ¶¶ 5, 9.)  Defendants Varner and Beard have denied his grievances and appeals therefrom.  (Id. at ¶¶ 31–35.)  Plaintiff also alleges that Beard has created a monopoly with respect to the commissary. Plaintiff claims that inmates are forced to buy items through the commissary where the prices are increased, as opposed to obtaining items from outside vendors at a lower price.  (Id. at ¶¶ 44, 45.)

It is further alleged that Defendants McMahon and Gembinski conspire with the guards in the Restricted Housing Unit ("RHU") to deny Plaintiff mental health treatment.  (Id. at ¶ 14, 16.)  Gembinski uses "distant doctors" to continue Plaintiff's psychological medications without first providing him with testing and regular patient visits.  (Id. at ¶ 20.)  Defendant McMahon intentionally delays Plaintiff's referrals due to "profit motives."  (Id. at ¶ 21.)

Hearing Examiner Mitchell has found Plaintiff guilty of misconducts.  (Id. at ¶ 40.) Plaintiff asserts that Mitchell was biased because he believed the officers' version of events instead of Plaintiff's statements.  (Id.)

Defendant Showalter allegedly denied medical treatment for Plaintiff's chronic skin infection, hiatal hernia and gastroesophageal reflux disease.  (Id. at ¶ 54, 56, 58.)  The skin condition causes Plaintiff to itch, burn and peel.  (Id. at ¶ 54.)  He further claims that surgery has been denied for a hernia that causes him to vomit when he consumes cold food and drinks.  (Id. at ¶ 56.)  Grievances filed regarding the treatment of his conditions have been denied.  (Id. at ¶ 57–58.)

Plaintiff alleges Defendants Hinkle and Fortney threw Plaintiff's legal brief in the trash in retaliation for prior complaints he filed against prison employees.  (Id. at ¶ 65.)  A grievance was pursued with respect to this matter.  (Id.)

Plaintiff also claims that the RHU lacks an automatic sprinkler system, emergency lighting, fire alarms, and that the showers are unsanitary.  (Id. at ¶ 41–42.)  He contends that inmates in the RHU are forced to inhale rodent waste.  (Id. at ¶ 43.)  Plaintiff seeks injunctive and compensatory damages for all of the foregoing violations. (Id. at 3.)[2]

An answer to the amended complaint was filed on June 18, 2009.  (Doc. No. 74.)

---

[2]  Any request for injunctive relief is now moot because Plaintiff is no longer confined at SCI-Huntingdon.  It is well recognized that the adjudicatory power of a federal court depends upon "the continuing existence of a live and acute controversy." Steffel v. Thompson, 415 U.S. 452, 459 (1974).  "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Id. at 459 n. 10 (citations omitted.) A prisoner's transfer or release from prison moots his claims for injunctive relief since he is no longer subject to the conditions he alleges are unconstitutional. Abdul-Akbar v Watson, 4 F.3d 195, 206–07 (3d Cir. 1993); Weaver v. Wilcox, 650 F.2d 22, 27 (3d Cir. 1981).

Thereafter, discovery and dispositive motions deadlines were imposed.  These deadlines were enlarged to provide the parties with additional time to conduct discovery, as well as permit the Court to address discovery motions.  On April 12, 2012, the Court resolved all outstanding discovery matters.  (Doc. No. 162.)  Although Plaintiff's motions to compel discovery were denied, Corrections Defendants were directed to provide Plaintiff with documents they attempted to produce to him on August 3, 2011, but that Plaintiff refused.  Any dispositive motions were directed to be filed within 45 days.

No dispositive motions were filed within the prescribed time period.  As such, on September 12, 2012, the parties were afforded the opportunity to file any dispositive motions within twenty (20) days.  On October 1, 2012, Corrections Defendants' filed the pending motion for summary judgment.  (Doc. No. 174.)  Although Plaintiff failed to timely submit his opposition, he has since filed a lengthy opposition brief and voluminous exhibits.  (Doc. Nos. 179, 180–184.)  In the interest of resolving the claims raised by this pro se litigant, the Court will consider his late filings in addressing Defendants' motion.

## II.    Standard of Review

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this evaluation, the court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to judgment as a matter of law."  MacFarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 271 (3d Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)).

When deciding the existence of a genuine dispute of material fact, the Court will award all reasonable inferences to the non-moving party.  <u>Meyer v. Riegel Products Corp.</u>, 720 F.2d 303, 307 n. 2 (3d Cir. 1983).  However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509–10, 91 L. Ed. 2d 202 (1986).  "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.'"  <u>Roth v. Norfalco</u>, 651 F.3d 367, 373 (3d Cir. 2011) (citing <u>Lamont v. New Jersey</u>, 637 F.3d 177, 181 (3d Cir. 2011)).

"[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  <u>Berckeley Inv. Group, Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006).  The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor.  <u>Liberty Lobby</u>, 477 U.S. at 256-57, 106 S. Ct. at 2514.  It is well-settled that "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials."  <u>Thimons v. PNC Bank, NA</u>, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted).  Thus, allegations made without evidentiary support may be disregarded.  <u>Jones v. UPS</u>, 214 F.3d 402, 407 (3d Cir. 2000).

### III.     Statement of Facts[3]

In support of their motion for summary judgment, Corrections Defendants have filed a
Statement of Undisputed Material Facts.  (Doc. No. 176.)  The evidentiary materials submitted in
support of these facts consist of the Declarations of Defendants Showalter and McMahon, and
relevant portions of Plaintiff's deposition transcript.  (Doc. No. 177.)  Pursuant to M.D. Pa.
Local Rule 56.1, in opposing Defendants' motion Plaintiff was required to file a separate
statement of material facts responding to the numbered paragraphs set forth in Defendants'
statement, including references to the parts of the record that support his opposing statements.
Local Rule 56.1 provides that all material facts set forth in a moving party's statement will be
deemed admitted unless controverted by the statement the opposing party is required to file.

Plaintiff fails to file a separate statement of opposing material facts that complies with
M.D. Pa. Local Rule 56.1.  Rather, he submits a document he intends to serve as his opposing
brief (Doc. No. 179), along with exhibits numbering over 1300 pages. (Doc. Nos. 182–184.).[4]
Buried in the middle of Plaintiff's brief is a section entitled "Disputed Issues."  (Doc. No. 179 at
9–12.)  Many of the assertions contained therein are merely unsupported reiterations of the
allegations in the amended complaint or legal conclusions.  However, to the extent any of
Plaintiff's statements oppose the facts set forth by the Corrections Defendants, and are supported

---

[3]  Unless otherwise noted, all citations to the record reflect the docket number and page
number assigned by the Official Court Electronic Document Filing System (CM/ECF), rather
than to the page numbers of the original documents.

[4]  The opposing brief is an unorganized hodge-podge combination of documents.
Included is a section entitled "Objections to Defendants' Summary Judgment Motion," portions
of earlier filings and orders issued by the Court in this action, and a section entitled
"Supplemental Objections to Defendants' Motion for Summary Judgment."  (Doc. No. 179.)
Many of the exhibits submitted are irrelevant and duplicative.

by the evidentiary materials he submits, they will be included in the following statement of facts.

Bailey was confined at SCI-Huntingdon from March 23, 2007 to October 29, 2007. (Doc. No. 177, Ex. A, Showalter Decl. ¶ 6.)  According to Plaintiff, he has serious medical needs with respect to his stomach and a skin infection.  (Doc. No. 177-3 at 5, Pl.'s Dep.)  He seeks to hold Defendant Showalter, a Health Care Administrator, liable for failing to override the medical doctor by sending him to a specialist outside of the prison.  Although Plaintiff believes this was because the prison did not want to pay to do so, nobody at SCI-Huntingdon ever told him this was the reason.  (Id.)  Showalter had contact with Plaintiff in 2007 in response to Grievances #182853 and #183329 he filed with the Grievance Coordinator at SCI-Huntingdon.  (Id. ¶ 8; Doc. No. 181-1 at 79, 93; Doc. No. 182 at 78.)  Because the grievances were related to medical care, the Grievance Coordinator assigned them to Showalter for investigation and initial response in her capacity as Health Care Administrator for SCI-Huntingdon.  (Id.; Doc. No. 177-1 at ¶15.)  These grievances were not filed against Showalter.  (Id.)  Showalter investigated each grievance and found no evidence that medical staff at SCI-Huntingdon failed to provide appropriate medical care to Plaintiff.  (Doc. 181-1 at 79, 93; Doc. No. 177-1 at ¶ 16.)

Plaintiff later filed a grievance against Showalter on August 9, 2007 (Grievance # 196712).  The basis of the grievance was the medical personnel's denial of Prilosec for his acid reflux condition and Vitamin A&D ointment for his skin condition that he believes cannot be corrected without surgery.  (Doc. No. 181 at 36, 38.)  The grievance was denied because Plaintiff's medical records indicated that a doctor had discontinued the Prilosec based on Plaintiff's most recent Upper GI test, which revealed no indication of a hiatal hernia.  In addition, Triamcinolone ointment was ordered for his skin condition at this time instead of A&D

ointment.  (Doc. 184-1 at 20, 60.)

At the time Plaintiff filed the above grievances, he was confined in the RHU.  (Doc. No. 177, Showalter Decl. at ¶ 10.)  Inmates in the RHU obtain medical treatment in one of two ways: the prisoner can request non-emergency medical attention by signing up for sick call or Block Officers notify the Medical Department when an RHU inmate requires emergency care.  (Id. at ¶¶ 11, 12.)  In either case, Medical Department staff report to the RHU to evaluate the inmate.  (Id. at ¶¶ 13, 14.)  Showalter does not provide medical services to the prisoners directly, and had no involvement in the medical treatment provided to Plaintiff for his hernia.  (Id. at ¶¶ 3, 17.)  She took no action to prevent or interfere with the medical care provided by physicians in response to Plaintiff's complaint, and has no authority to approve or disapprove decisions related to medical care made by a treating health professional.  (Id. at ¶¶ 4, 18.)

From April 25, 2007 to October 7, 2007, Defendant McMahon saw Plaintiff six (6) times.  (Doc. No. 177, Ex. B, McMahon Decl. ¶ 6.)  On April 25, 2007, Plaintiff complained of loss of appetite and loss of sleep.  (Id. ¶ 3.)  McMahon recommended methods of relaxation.  (Id.; Doc. No. 182 at 81.)  On May 23, 2007, Plaintiff requested to see McMahon with respect to his mental health and nightmares he was experiencing.  (Doc. No. 182 at 73.)  McMahon responded on May 29, 2007, and informed Plaintiff he would be seen on her next RHU round.  Plaintiff was also informed that any request he was making for a single cell would need to be made to his counselor.  (Id.)  On June 20, 2007, Plaintiff complained of night sweats and anxiety.  (Id. ¶ 4.)  McMahon referred him to the psychiatrist.  (Id.)  On June 29, 2007, Plaintiff requested an appointment.  (Id. ¶ 5.)  McMahon met with Plaintiff but later ended the appointment and issued Plaintiff a misconduct because he began to masturbate.  (Id.)  Plaintiff denies that he was

engaging in said conduct.

On July 24, 2007, Plaintiff submitted a written request to speak with McMahon about his mental health.  (Doc. No. 181-2 at 24.)  On July 26, 2007, McMahon informed Plaintiff she would see him during her next RHU rounds.  (Id.)  Plaintiff was seen on July 31, 2007, and McMahon referred him to a psychiatrist.  (Id. ¶ 6.)  McMahon saw Plaintiff again on October 3, 2007, in response to a request he submitted about concerns regarding his grandmother.   (Id. ¶ 7.) McMahon referred this information to the appropriate staff.  On October 6, 2007, Plaintiff requested information about voluntary mental health commitments and McMahon answered his questions.  McMahon states that she did not ignore Plaintiff's complaints or deny him medical care in response thereto.  (Id. ¶¶ 9, 10.)  Plaintiff admits to having seen McMahon at least three or four times while he was in the RHU.  (Doc. No. 177-3 at 3, Pl's Dep.)  He also agrees that during those visits, she would inquire as to his problems.  He agrees that she is unable to prescribe medication and he is unaware as to whether she ever referred him to anyone else for treatment.  (Id.)

Dr. Gembinski came to the RHU on August 21, 2007, in response to a call received from the RHU staff.  Plaintiff was angry, depressed and inquiring about methods to kill himself. (Doc. No. 180-2 at 96.)  After speaking with Plaintiff, Gembinski issued a report recommending Plaintiff's placement in 24-hour observation status with only his RHU mattress, sneakers, smock and blanket.  (Doc. No. 180-2 at 96, Report of Irrational Behavior.)  This recommendation was immediately approved by order of Dr. Del Villar, prison psychiatrist.  On August 23, 2007, the Program Review Committee conducted an administrative hearing to review Gembinski's report. (Doc. No. 180-2 at 97, PRC Decision.)  The PRC released Plaintiff from observation and placed

9

him on 72 hour watch and continued him on DC status.  This action was taken pursuant to Dr. Del Villar's assessment of Plaintiff earlier that day and Plaintiff's statement that he was doing better. (Id.)

Plaintiff claims that Varner violated his constitutional rights when she denied his grievances.  Grievances were submitted to Varner with respect to many prison issues, including wearing shackles for his 2-hour library periods, lack of legal assistance and attending library to work with other inmates, but said grievances were filed against other prison employees, not Varner.  Varner reviewed the grievances in her capacity as Grievance Coordinator.  (Doc. Nos. 180-1 at 13, 99.)  Plaintiff also sent Inmate Requests to Varner regarding issues not raised in his complaint, and she either responded thereto or directed his requests to other prison officials for response.  (Doc. No, 182 at 87, 89, 90, 92, 94.)

Charles Mitchell was a Hearing Examiner at SCI-Huntingdon at the relevant time and found Plaintiff guilty of charged misconducts.  According to Plaintiff, he believed the correctional officers over Plaintiff.  (Doc. No. 177-3 at 5, Pl.'s Dep.)

Defendant Fortney picked up documents on the floor outside of Plaintiff's RHU cell and gave them to Defendant Hinkle on April 23, 2007.  Hinkle threw these papers in the trash.  This conduct did not cause a court to throw any case Plaintiff had pending out of court.  (Doc. No. 177-3 at 5–6, Pl.'s Dep.)  Plaintiff filed a grievance with respect to this issue (Grievance # 185414) on April 23, 2007.  He complained that a legal brief sent to him by opposing counsel in an appeal he had pending with the Pennsylvania Supreme Court, see In Re: Ross Nicholas, et al v. Beard, No. 42 EAP 2006 (Pa. Supreme Court), was taken from him and discarded in retaliation for complaining about prison guards.  (Doc. No. 180-1 at 71.)

10

Plaintiff maintains that the Pennsylvania Department of Corrections policy statement

with respect to commissary/outside purchases by inmates is contained in DC-ADM 815.  (Doc.

No. 180 at 13.)  Plaintiff names Jeffrey Beard as a Defendant in this action because of his

"[m]onopolization of commissary procedure" by charging a higher costs for items than they cost

outside of the prison.  (Doc. No. 177-3 at 4; Doc. No. 180-1 at 19. )

**IV.     Discussion**

    **A.     Discovery related issues**

In opposing Defendants' motion for summary judgment, Plaintiff raises objections on the

basis of lack of discovery.  These arguments are no more than thinly-veiled attempts to rehash

discovery requests that have previously been addressed and rejected by the Court.  On April 12,

2012, the Court addressed a motion for relief, sanctions and to compel discovery filed by

Plaintiff addressing the very same issues he now seeks to reinvent in an attempt to oppose

summary judgment.  (Doc. No. 162.)  For example, he again seeks to obtain copies of

commissary contracts and confidential portions of Procedural Manuals and health records.  The

Court previously addressed and denied these arguments over two (2) years ago, and will not now

revisit the matter.

    **B.     Jeffrey Beard**

Plaintiff seeks to impose liability upon Defendant Beard in connection with the operation

of the prison commissary because he is forced to purchase products there at prices much higher

than they are sold by outside vendors.  First, there is no federal constitutional right to purchase

items from a commissary.  See Beard v. Banks, 548 U.S. 521, 523–24, 526 (2006) (holding that

access to a commissary by a prisoner is a privilege, not a protected right).  Moreover, prisoners

have no federal constitutional right to purchase items from the prison commissary at any particular price.  See McCall v. Keefe Supply Co., 71 F. App'x 779, 780 (10th Cir. 2003) (inmate's claim that prison commissary charged "outrageous" prices for goods purchased through the prison commissary failed to state a constitutional claim); French v. Butterworth, 614 F.2d 23, 25 (1st Cir. 1980) ("We also reject French's contention that he and fellow inmates have a constitutionally protected interest in buying food as cheaply as possible"); see also Myrie v. Commissioner, N.J. Dept. of Corrections, 267 F.3d 251 (3d Cir. 2001) (rejecting inmates' constitutional claims challenging a ten percent surcharge on purchases from commissaries in New Jersey).  Because there is simply no legal basis for a demand that inmates be offered items for purchase by the prison commissary at or near cost, Defendants are entitled to summary judgment with respect to this claim.

Plaintiff also claims that Beard violated his constitutional rights when he sustained the denial of his grievances on appeal.  To establish liability for the deprivation of a constitutional right, a plaintiff must demonstrate personal involvement by a defendant.  Rode v. Delarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Such involvement may be established through: 1) personal direction or actual participation by the defendant in the misconduct; or 2) knowledge of and acquiescence in the misconduct.  Id.

Plaintiff seeks to hold Defendant Beard liable for his role in reviewing his grievances on appeal.  The Court is mindful of the fact that inmates do not have a constitutional right to a prison grievance system.  See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 137–38 (1977); Speight v. Sims, 283 F. App'x 880, 881 (3d Cir. 2008) (citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001) ("[T]he existence of a prison grievance procedure

confers no liberty interest on a prisoner.")).  Moreover, participation in the after-the-fact review of a grievance or appeal is insufficient to establish personal involvement on the part of those individuals reviewing grievances.  See Rode, 845 F.2d at 1208 (finding the filing of a grievance insufficient to show the actual knowledge necessary for personal involvement); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (holding that a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to a prison grievance, did not establish that the officials and administrators were involved in the underlying misconduct).

Based on the foregoing, Plaintiff's allegation that Beard should be held liable for alleged constitutional violations through his review of grievance appeals is insufficient to establish his personal involvement in the underlying alleged unconstitutional conduct.  As such, Defendants are entitled to summary judgment with respect to this claim.

## C.    Defendants Fortney and Hinkle

In his deposition, Plaintiff states he is suing Defendants Fortney and Hinkle because they threw his legal brief in the trash.  (Doc. No. 177-3 at 5.)  He claims they did so in retaliation for filing complaints against prison guards.[5]  The discarded document was an appellate brief Beard's attorney had filed in an appeal Plaintiff was pursuing in the Pennsylvania Supreme Court in Docket No. 42 EAP 2006.

To the extent Plaintiff claims that Defendants deprived him of his property without due

---

[5]  In their motion for summary judgment and supporting brief, Defendants do not address the retaliation claim alleged against Defendants Fortney and Hinkle.  While they argue in their reply brief that Plaintiff's retaliation claim lacks facts and evidence, the Court will not consider arguments raised for the first time in a reply brief and lacking proper support.  As such, Plaintiff's claim of retaliation will proceed.

process of law, Defendants are entitled to summary judgment.  In Hudson v. Palmer, 468 U.S. 517 (1983), the Supreme Court held that an unauthorized, intentional deprivation of property by a state employee does not constitute a violation of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available.  Id. at 533. Plaintiff had an adequate post-deprivation remedy for any loss he suffered available through the prison's grievance system.  Spruill v. Gillis, 372 F.3d 218, 232 (3d Cir. 2004).  As such, the loss of his legal paperwork is not actionable pursuant to § 1983.

To the extent Plaintiff raises a claim of denial of access to the courts, the undisputed facts reveal that Defendants are entitled to summary judgment. It is well established that an inmate has a constitutional right of access to the courts.  Lewis v. Casey, 518 U.S. 343, 349–56 (1996); Bounds v. Smith, 43o U.S. 817 (1977); Abdul-Akbar v. Watson, 4 F.3d 195, 202–03, 205 (3d Cir. 1993).  However, the Supreme Court in Lewis emphasized that a plaintiff alleging the denial of access to the courts must show "actual injury."  Lewis, 518 U.S. at 349–57.  "To establish a cognizable access to the courts claim, a complainant must demonstrate that: (1) he suffered an 'actual injury' (i.e., that he lost an opportunity to pursue a nonfrivolous claim); and (2) he has no other remedy, save the present civil rights suit that can possibly compensate for the lost claim." Williams v. Clancy, 449 F. App'x 87, 89 (3d Cir. 2011) (citing Monroe v. Beard, 536 F.3d 198, 205 (3d Cir. 2008); see also Christopher v. Harbury, 536 U.S. 403, 415–17 (2002).

It is undisputed that Defendants disposed of Plaintiff's legal document.  However, regardless of whether an issue of fact exists as to whether Defendants knowingly or inadvertently threw it away, the undisputed facts in the record reveal that Plaintiff did not suffer any actual injury from the loss of this legal document.  In his deposition, he admits that at the time

14

Defendants picked up his paperwork and threw it into the trash, the papers were lying outside of his cell.  (Doc. No. 177-3 at 5.)  In the grievance he filed over this issue, Plaintiff stated he needed the brief so he could file his response to it.  (Doc. No. 180-1 at 73.)  When asked whether Defendants' actions resulted in his case being thrown out of court, he responded, "Specifically from that, no."  (Doc. No. 177-3 at 5.)

Moreover, in reviewing the Pennsylvania Supreme Court appellate docket in 42 EAP 2006 submitted by Plaintiff, it shows that he and his co-appellant continued to litigate the appeal well after the time Defendants discarded the brief.  (Doc. No. 180-1 at 85.)  Defendants' actions occurred on April 21, 2007, as evidenced by the grievance Plaintiff filed with respect to this issue.  (Doc. No. 180-1 at 71.)  The docket sheet in the Supreme Court appeal reveals that Plaintiff and his co-appellant filed a motion to strike Beard's brief on April 2, 2007.  On August 2, 2007, Plaintiff filed an application for leave to file an amendment to the motion to strike and to submit exhibits.  It was not until November 19, 2008 when the Pennsylvania Supreme Court affirmed the decision of the Commonwealth Court in the relevant action.  The appeal was not dismissed for failure to prosecute.  As such, it is clear Defendants' actions did not result in any actual injury to Plaintiff.  He not only filed a response to the brief, but also continued to litigate the appeal well after the brief was discarded by Defendants.

**D.    Defendant Mitchell**

At the relevant time, Defendant Mitchell was a Hearing Examiner at SCI-Huntingdon. Plaintiff generally asserts that Mitchell violated his rights under the Due Process Clause of the Fourteenth Amendment by finding him guilty during misconduct hearings.  He claims he believed the officers instead of him in violation of his constitutional rights.  He does not

reference any particular misconduct hearings in his amended complaint.  Defendants move for summary judgment on the basis that Plaintiff's liberty interests were not implicated and his due process rights were not triggered at his misconduct hearings.

To assert a right to procedural due process, Plaintiff must have a liberty or property interest protected by the Due Process Clause of the Fourteenth Amendment.  Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).  "A prisoner facing the loss of a legally cognizable liberty interest following disciplinary proceedings has a due process right to certain procedural protections, including the opportunity to call witnesses and present documentary evidence."  Dunbar v. Barone, 487 F. App'x 721, 724 (3d Cir. 2012)(addressing an inmate's claim that his procedural due process rights were violated when he was not permitted to call witnesses at his misconduct hearing)(citing Wolff v. McDonnell, 418 U.S. 539, 566–67 (1974)). "But, this due process right is not triggered unless the prison 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Dunbar, 487 F. App'x at 724–25 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).

"[C]onfinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest."  Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (quoting Sandin v. Conner, 515 U.S. 472, 486 (1995).  To determine if an inmate's placement was atypical, the Court considers: 1) the amount of time the prisoner was placed into disciplinary segregation and 2) whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement.  Shoats, 213 F.3d at 144.

Plaintiff was only confined at SCI-Huntingdon from March 23, 2007 through October 29,

2007, a period of just over 7 months total.  (Doc. No. 177-1 at 3, Showalter Dep. ¶ 6.)  In his complaint, he does not identify the hearings Mitchell presided over in which he was allegedly denied due process.  However, in opposition to Defendants' summary judgment motion, he does submit documentation related to numerous misconduct appeals he pursued during his confinement at SCI-Huntingdon.  (Doc. No. 180-2 at 63–100; Doc. No. 183 at 1–36.)  These documents do not identify the Hearing Examiner at each of the proceedings.  However, in drawing all inferences in favor of Plaintiff, even if the Court assumes that Mitchell was the Hearing Examiner with respect to each of these proceedings, Plaintiff was only sanctioned to periods ranging from 45–180 days following the finding of guilt in each instance.[6]  (Id.)

Plaintiff fails to come forward with any facts showing that the length of his confinement, or the conditions of his confinement in the RHU, amounted to an "atypical and significant hardship" under Sandin so as to deprive him of a protected liberty interest.  See Crosby v. Piazza, 2012 WL 641938, at *3–4 (3d Cir. Feb. 29, 2012) (a total of 270 days in the RHU after being found guilty of misconduct does not constitute an atypical and significant hardship under Sandin); Edmonds v. Sobina, 296 F. App'x 214 (3d Cir. 2008) (90 days in the RHU not an "atypical and significant hardship"); Smith, 293 F.3d at 654 (holding that seven months disciplinary confinement "does not, on its own, violate a protected liberty interest as defined in Sandin); Griffin v. Vaughn, 12 F.3d 703, 706 (3d Cir. 1997) (finding that fifteen months in segregation was not an atypical and significant hardship).  Clearly, Plaintiff's disciplinary confinement as a

---

[6]  The majority of sanctions on each of the various misconducts arising during Plaintiff's incarceration at SCI-Huntingdon were either 60 or 90 day sanctions.  On one occasion he received a sanction of 180 days, but this was with respect to a finding of guilt on two charges. (Doc. No. 180-2 at 70.)

result of the misconduct sanctions did not constitute an atypical and significant hardship in

relation to the ordinary incidents of prison life.  As such, his liberty interests were not implicated

and his right to due process at the misconduct hearings was not triggered in the first instance.

Defendants are therefore entitled to summary judgment with respect to the alleged Fourteenth

Amendment violation.

### E.      Defendant Varner

Plaintiff seeks to hold Defendant Varner liable because she did not find any merit with

respect to the grievances he filed while at SCI-Huntingdon.[7]  (Doc. No. 177-3 at 4, Pl.'s Dep.)

The filing of a grievance is a constitutionally protected activity.  Robinson v. Taylor, 204 F.

App'x 155, 156-57 (3d Cir. 2006).  Although prisoners have a constitutional right to seek redress

of grievances as part of their right of access to courts, this right is not compromised by the failure

of prison officials to address those grievances.  Booth v. King, 346 F. Supp. 2d 751, 761 (E.D. Pa.

2004).  This is because inmates do not have a constitutionally protected right to a grievance

procedure.  Burnside v. Moser, 138 F. App'x 414, 416 (3d Cir. 2005) (citations omitted) (failure

of prison officials to process administrative grievance did not amount to a constitutional

violation).  Additionally, it is well-established that "a prison officials's secondary review of an

inmate's grievance or appeal is not sufficient to demonstrate the personal involvement required to

establish the deprivation of a constitutional right."  Simonton v. Tennis, 437 F. App'x 60, 62 (3d

Cir. 2011) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207–08 (3d Cir. 1988)); Brooks v.

---

[7] Although in his deposition Plaintiff also claims Varner placed him on grievance restriction and only allowed him to file a grievance every fifteen days, he does not raise this as an issue in his amended complaint.  In any event, Plaintiff readily admits that he filed many grievances during his seven month confinement at SCI-Huntingdon.  (Doc. No. 177-3 at 4.)

Beard, 167 F. App'x 923, 925 (3d Cir. 2006).  Thus, because the alleged conduct of Defendant

Varner is limited to her involvement in the grievance procedure, no liability can be found against

her.

### F.      Defendants McMahon, Gembinski and Showalter

Defendants Showalter, McMahon and Gembinski are alleged to have denied Plaintiff

adequate mental health and/or medical care during his confinement at SCI-Huntingdon in

violation of the Eighth Amendment to the United States Constitution.  To sustain these claims, he

must plead facts which:

[M]eet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently
serious;" and (2) the "prison official must have a sufficiently culpable state of mind."  Farmer v.
Brennan, 511 U.S. 825, 834 (1994)(quotation marks and citations omitted).  In prison conditions
cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety."  Id.

Beers Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001).  "Deliberate indifference" is a

subjective standard; to satisfy it the prison official "must actually have known or been aware of

the excessive risk to inmate safety."  Id.

In the medical context, a constitutional violation under the Eighth Amendment occurs

only when state officials are deliberately indifferent to an inmate's serious medical needs.  Estelle

v. Gamble, 429 U.S. 97, 105 (1976).  To establish a violation of his constitutional right to

adequate medical care in accordance with this standard, an inmate is required to point to evidence

that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that

indicate deliberate indifference to that need.  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton

infliction of pain."  Estelle, 429 U.S. at 104.  Such indifference may be evidenced by an

intentional refusal to provide care, delayed provision of medical treatment for non-medical

reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Dormer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Dormer, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. Such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. See, e.g., Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990)('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')". Gindraw v. Dendler, 967 F. Supp. 833, 836 (E.D. Pa. 1997). Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care than an inmate received, particularly where it can be shown that significant medical services were provided, but the prisoner is dissatisfied with the outcome of these services. See, e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't of Corrections, 230 F. App'x 195 (3d Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006). Any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since medical determinations remain a question of sound professional judgment. See Inmates of Allegheny

County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).

In addition, it is well-established that for non-medical defendants, to fulfill the deliberate indifference element, Plaintiff must show that the non-medical prison official had reason to believe or actually knew that prison doctors or their assistants were mistreating or not treating Plaintiff.  See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004); Dormer, 991 F.2d at 69.  "If a prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands ... [A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."  Spruill, 372 F.3d at 236.

1.      Mental health care

 During the relevant time, Defendants McMahon and Gembinski were employed as Psychological Services Specialists at SCI-Huntingdon.  (Doc. No. 177-2, ¶ 1; Doc. No. 180-2 at 96.)   The undisputed record undermines Plaintiff's claims that McMahon was deliberately indifferent to his mental health care needs and/or refused to refer him to doctors for financial reasons.  McMahon saw Plaintiff on at least six occasions between April 25, 2007 and October 7, 2007.  On April 25, 2007, when he complained of loss of appetite and sleep, she recommended methods of relaxation.  On June 20, 2007, when he complained of night sweats and anxiety, she referred him to the psychiatrist.  On June 29, 2007, Plaintiff requested an appointment with McMahon.  There is no dispute that McMahon met with him on this date.  Although he disputes why the meeting was later terminated, the undisputed facts in the record support that McMahon met with him on this date and that a misconduct was issued to him for masturbating.

McMahon also met with Plaintiff in late July of 2007 at his request.  (Doc. No. 181-2 at 24.)  Because his concerns dealt with mental issues such as "feeling on the edge" and "the walls closing in," she referred him to a psychiatrist.  She again saw Plaintiff on October 3, 2007, per his request.  In response to concerns about his grandmother, McMahon referred him to the appropriate staff member who handled such issues.  The record reveals documentation evidencing that such concerns were addressed by other staff members.

On October 16, 2007, Plaintiff requested information about voluntary mental health commitments.  McMahon answered his questions.  (Doc. No. 177-2.)  The record is completely devoid of any evidence that McMahon disregarded any complaint made to her by Plaintiff or prevented him from receiving recommended treatment for his problems.  There is also no support for his conclusory allegation that she acted or failed to act based on profit motives.  Plaintiff admits that McMahon, as a psychological services specialist, could not prescribe him any medication.  He further admits that he does not know if she ever referred him to anybody else.  While perhaps dissatisfied with the services received from McMahon, the undisputed record fully supports the finding that in McMahon's limited involvement in Plaintiff's mental health care, she was not deliberately indifferent to any serious mental health care need.

The undisputed record reveals that Gembinski saw Plaintiff on one occasion, August 21, 2007.  He was called to the RHU by staff to evaluate Plaintiff who stated he was depressed and wanted to kill himself.  (Doc. No. 180-2 at 96, DC-141 Report.)  Staff placed Plaintiff in a holding cell until Gembinski's arrival.  (Doc. No. 184-1 at 45.)  After meeting with Plaintiff, Gembinski reported that he was behaving irrationally and expressed a desire to harm himself.  Plaintiff had the cell door covered, and was not responding to orders.  Based upon Gembinski's

report to Dr. Del Villar, prison psychiatrist, an order was issued admitting Plaintiff to the POC for 24 hour observation status as a danger to himself, and directing that he be provided only with a ferguson smock, blanket, RHU mattress and shoes as per DC ADM 802.  The submitted medical records verify that Plaintiff was being treated with Prozac and Elavil, and that he was constantly monitored by staff during his observation period.  (Doc. No. 184-1 at 19; 43, 45, 60.)

The Program Review Committee conducted a follow-up administrative hearing on August 23, 2007.  (Doc. No. 180-2 at 97.)  Plaintiff was released from observation, placed on 72 hour watch, and continued on DC status based upon Dr. Del Villar's examination of Plaintiff earlier in the day.  (Id.)

To the extent Plaintiff also seeks to impose liability on Defendant Gembinski in his administrative capacity as Mental Health Coordinator, the material facts fail to demonstrate any evidence that Plaintiff complained to Gembinski that he was not receiving adequate mental health care from the appropriate staff at SCI-Huntingdon.  More importantly, the undisputed medical records fail to support any finding of deliberate indifference toward Plaintiff's mental health needs.  Rather, they demonstrate that he was continuously provided mental health evaluation and treatment by Psychiatrists H. Del Villar, M.D. and Eugene Polmueller, M.D. during his SCI-Huntingdon confinement.  There is no evidence in the record to demonstrate that Plaintiff ever complained to Gembinski that he was not receiving appropriate care.  In fact, the documents submitted including progress notes, physician's orders, medical chart entries, and medication administration entries reveal the opposite. (Doc. No. 184 at 79–100; 184-1 at 1–93.)  For these reasons, the Court also finds that Defendant Gembinski is entitled to summary judgment with

respect to Plaintiff's Eighth Amendment claims.[8]

    2.      Medical Care

    Many of Plaintiff's medical claims for skin, hernia and GERD conditions were asserted against Defendant Auman.  On March 29, 2013, Auman was granted summary judgment on these claims.  (Doc. No. 187.)  However, Plaintiff also asserts liability under the Eighth Amendment against Defendant Showalter in her capacity as Correctional Health Care Administrator.

    The Eighth Amendment is limited in a prison medical setting where an inmate directs his claims of inadequate medical care against non-medical correctional staff.  It is well-established that non-medical personnel may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).  The rationale for this rule has been aptly explained by the United States Court of Appeals for the Third Circuit in the following terms:

> If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.  This follows naturally from the division of labor within a prison.  Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.  Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.  Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.  Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a nonmedical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

---

    [8] For all of the above reasons, any conclusory allegation that Defendants McMahon and Gembinski conspired to deny Plaintiff mental health care is wholly without merit and unsupported by the record.

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).

Plaintiff specifically seeks to impose liability against Showalter for the denial of medical treatment for his ". . . stomach and [his] skin condition." (Doc. 177-3, Pl.'s Dep. at 5.) Showalter is not a physician. In her capacity as a CHCA, the record demonstrates that her responsibilities are purely administrative, and do not include providing health care to inmates or making decisions regarding an inmate's medical treatment. (Doc. No. 177-1.) Inmates confined in the RHU, such as Plaintiff, obtain medical treatment by either signing up for sick call or, in emergency situations, Block Officers call the medical department. (Id.) In both cases, medical staff go to the RHU to administer care.

The Progress Notes in Plaintiff's medical record reveal that upon intake at SCI-Huntingdon, he reported suffering from chronic skin dryness, peeling and itching, and a hiatal hernia. His treatments for those conditions was continued. (Doc. No. 184-1 at 54.) Showalter had contact with Plaintiff in her capacity of responding to grievances complaining about medical care referred to her by the Grievance Coordinator. Grievance 182853 was filed against Defendant Auman immediately after Plaintiff's arrival at SCI-Huntingdon, and asserted the lack of medical care for his skin condition. (Doc. No. 180 at 54.) First, summary judgment has previously been granted in favor of Defendant Auman with respect to the Eighth Amendment medical care claims alleged against her. Moreover, the record demonstrates that Showalter investigated and responded to this grievance after conducting a review of Plaintiff's medical records. She found that Plaintiff was seen by the physician's assistant the day after his arrival and prescribed treatment by Auman. (Id. at 55; 183-1 at 6.) Two days later Plaintiff filed a grievance about the denial of care for his skin. He was told to sign up for sick call to be evaluated and if his condition

indicated a specialist, a referral would be ordered.  (Id.)

Grievance 183329 was filed on April 2, 2007, wherein Plaintiff complained about the lack of medical care from Auman with respect to his stomach and her refusal to provide him with a medical pass for a cotton blanket.  He also claimed he was denied an enhanced diet bag.  (Id. at 61.)  Showalter was assigned to respond to this grievance as well.  After reviewing Plaintiff's medical records, she found he had been seen twice since his transfer to SCI-Huntingdon on March 23, 2007.  The medical records revealed that Auman had requested a non-wool blanket for Plaintiff, but because no medical order was needed, he was to request the blanket through his Unit Manager.  (Id. at 62.)  In addition, an enhanced snack bag is only ordered if medically necessary and, according to Plaintiff's medical chart, he did not meet the criteria.  (Doc. No. 184-1 at 55.)  Rather, the undisputed evidence shows that a diet order form for a basic snack bag issued by Dr. Del Villar was in effect from 9/14/07 through 12/14/07.  (Doc. No. 184 at 81.)   Showalter cannot be found deliberately indifferent for failing to defer to Plaintiff's judgment about appropriate care based purely upon his disagreement with the ordered care of his treating physician.

The record also contains a response by Showalter to an Inmate Complaint submitted by Plaintiff on May 9, 2007.  The complaint concerned a request he made to a prison nurse for A&D Ointment and Tar shampoo. (Doc. No. 182 at 82.)  The matter was referred to Showalter for response.   After investigating the matter, Showalter found that the nurse had issued Plaintiff the shampoo, but informed him his refill on the lotion was not yet due.  Several days later, the nurse had discovered that Plaintiff was actually hoarding ointment and shampoo in his cell.  As such, Showalter informed Plaintiff that any further incidents of hoarding may result in the discontinuance of his medication.   (Doc. No. 182 at 78.)

The next contact Showalter had with Plaintiff was on August 9, 2007, with respect to a grievance (196712) he filed against her and two other medical staff members.  He complained of the denial of Prilosec for his stomach, and A&D Ointment for his skin condition.  (Doc. No. 181-1 at 38.)  The grievance was denied because Plaintiff's most recent Upper G.I. x-ray showed no indication of a hiatal hernia.  (Doc. No. 184-1 at 6.)  As such, Dr. Klemick discontinued the order for Prilosec on this basis.  (Id. at 36.)  In addition, Plaintiff's medical records revealed that he had an order for Triamcinolone ointment, not Vitamin A&D ointment at the relevant time.  (Doc. 184-1 at 60.)

While Plaintiff may have disagreed with the doctor's orders and still desired Prilosec, and preferred A&D Ointment over Triamcinolone, this disagreement does not rise to the level of an Eighth Amendment claim.  The undisputed medical record demonstrates he was being treated by prison medical personnel for his conditions, and Showalter was justified in believing he was in capable hands.

These are the only direct contacts between Showalter and Plaintiff evidenced in the record.  In light of the foregoing, no reasonable jury could render a verdict in Plaintiff's favor that Showalter was deliberately indifferent to his medical care.  Moreover, Plaintiff's undisputed medical records—including Progress Notes, Physician's Orders, and Medication Administration Records covering the entire period of his incarceration at SCI-Huntingdon from March 23, 2007 to October 29, 2007—reveal constant, continuous care for his skin and stomach conditions, as well as other complaints raised.  The Progress Notes document that Plaintiff was seen in sick call a minimum of 15 times, and was provided numerous medications and testing in response to his complaints, as evidenced by the Physician's Orders and Medication Administration charts.  (Doc.

No. 184 at 79–100; Doc. 184-1 at 1–93.)  There is simply no evidence that Showalter had any reason to believe, or actual knowledge, that prison doctors or their assistants were mistreating or not treating Plaintiff, or that she failed to approve referral to any outside specialist due to cost motives. As such, no reasonable jury could render a verdict in Plaintiff's favor, and the Court must grant the Corrections Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment claims against Defendant Showalter.

### G.    Conditions of Confinement Claims

Plaintiff also raises Eighth Amendment challenges with respect to several conditions in the Restricted Housing Unit.  He claims there is a lack of an automatic sprinkler system, emergency lighting and fire alarms.  He also complains that he and other inmates are forced to inhale rodent urine and feces, and that the showers are unsanitary.  (Doc. No. 27, Amended Compl. ¶¶ 41-43.)

Defendants do not move for summary judgment with respect to Plaintiff's conditions of confinement claims.  However, in their summary judgment reply brief, they raise the issue of unsanitary shower conditions in the RHU.  The Court will not consider arguments raised for the first time by Defendants in a reply brief and without proper support.  As such, these claims will also proceed.  An appropriate order follows.